FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2012 OCT 25 P 3: 07

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **RONALD P. YOUNG**<br>689 County Road 102<br>Mountain Home, Arkansas 72653<br><br>And<br><br>**RAMONA YOUNG**<br>689 County Road 102<br>Mountain Home, Arkansas 72653<br><br>    Plaintiffs,<br><br>v.<br><br>**CHS MIDDLE EAST, LLC,**<br>**10701 Parkridge Blvd., Suite 200**<br>**Reston, Virginia 22603**<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION FILE NO. 1:12cv1202<br>)                          GBL/JFA<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF REMOVAL

TO:   United States District Court, Eastern District of Virginia

Clerk, Circuit Court of Fairfax County, Virginia

Re:   Case No. 2012-13754

**PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. § 1446(a),

Defendant CHS MIDDLE EAST, LLC, (hereinafter referred to as "CHSME"),

hereby removes this case to the United States District Court for the Eastern District

of Virginia, based upon the following grounds:

1.     This action was commenced in the Circuit Court of Fairfax County, Virginia, on September 14, 2012, the date on which the Summons and Complaint were filed with the Clerk of Circuit Court for Fairfax County, and was assigned Case No. 2012-13754.  Plaintiffs' counsel served the Summons and Complaint on CHS' agent on September 25, 2012.

2.     Fairfax County Circuit Court lies within the division of the United States District Court wherein this Notice of Removal is filed.

3.     Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is filed within thirty (30) days after CHSME's acceptance of service of the initial Summons and Complaint setting forth the claim for relief upon which this action is based.

4.     The Complaint alleges common law and statutory theories of recovery against Defendant CHSME.   Plaintiffs are individuals who are citizens and residents of Mountain Home, Arkansas.  CHSME is a Maryland limited liability company whose principal place of business is in the State of Florida.  The sole member of defendant CHSME is a corporation, Comprehensive Health Services International, Inc. ("CHS").  CHS is incorporated in Maryland and its principal place of business is in the state of Florida.  CHSME employed Plaintiffs during all times relevant to Plaintiffs' Complaint for services to be primarily performed in Iraq.

5.     The amount in controversy exceeds $75,000, exclusive of interest and costs, and, therefore, satisfies the jurisdictional requirements of 28 U.S.C. § 1332.

6.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441, as amended, in that (a) the Complaint involves citizens of different states, (b) the amount in controversy exceeds $75,000, exclusive of interest and costs, and (c) the entire case is appropriate for removal to this Court.

7.     As required by 28 U.S.C. § 1446(a), attached hereto is a copy of the Plaintiffs' Complaint filed in the Circuit Court for Fairfax County, Virginia, which is all of the process, pleadings, and orders heretofore served upon Defendant CHSME in this action.

8.     Pursuant to 28 U.S.C. § 1446(d) copies of this Notice of Removal are today being served upon all adverse parties and mailed to the Clerk of the Circuit Court of Fairfax County for filing.

DATED this 25th day of _____ October _____, 2012.


Respectfully submitted,


Carlos M. Recio, Esq.
Virginia Bar No. 24572
1016 7th Street SE
Washington, D.C. 20003
202-293-5690 (office)
202-543-0770 (fax)
crecio@reciolaw.com


Of Counsel:

Michael A. Sexton
Georgia Bar No. 636489
WEINBERG, WHEELER, HUDGINS,
GUNN & DIAL, LLC
3344 Peachtree Road, NE, Suite 2400
Atlanta, Georgia  30326
404-876-2700

*Attorneys for Defendant CHS Middle East, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon counsel for all parties to this proceeding by first class mail and email sent to:

R. Scott Oswald, Esq.
Nicholas Woodfield, Esq.
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900,
Washington, D.C. 20006
(soswald@employmentlawgroup.com).


This _25th_ day of _____October_____, 2012.


_Carlos M. Recio_

Carlos M. Recio, Esq.

VIRGINIA:

FILED
CIVIL INTAKE
2012 SEP 14 AM 12: 49
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

RONALD P. YOUNG,    )
689 County Road 103    )
Mountain Home, Arkansas  72653    )
)
and    )
)
RAMONA YOUNG,    )
689 County Road 103    )
Mountain Home, Arkansas  72653    )
)
           Plaintiff,    )
)
v.    )      Case No.   2012 - 13754
)
CHS MIDDLE EAST, LLC,    )
10701 Parkridge Blvd.,    )
Suite 200    )
Reston, Virginia 22603,    )
)
           Defendant.    )
)
   Serve:    )
)
      CT Corporation System    )
      4701 Cox Rd    )
      Suite 301    )
      Glen Allen, Virginia 23060    )
)

## COMPLAINT

1.    Defendant CHS Middle East, LLC ("CHS") illegally terminated Ronald Young and Ramona Young because they reported their concerns about the lack of written protocols and substandard care being provided to patients at Sather Air Force Base ("Sather"), Iraq to CHS management and U.S. Department of State officials.  By terminating Ronald Young and Ramona Young for their disclosures to CHS management and U.S. Department of State officials, CHS

violated the Florida Whistleblower Protection Act and in violation of the Commonwealth of Virginia's common law public policy exception to the at-will employment doctrine recognized by the Commonwealth in *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985).

2.     Sather Air Force Base changed its name in or around December 2011 to the Baghdad Diplomatic Support Hospital when the base changed from U.S. Department of Defense to U.S. Department of State control.

## JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over Defendant pursuant to Va. Code Ann. § 17.1-514.

4.     Both Ronald and Ramona Young's employment agreements with CHS specify that the Commonwealth of Virginia courts shall have exclusive jurisdiction and venue over any proceeding arising from or related to this employment agreement.

5.     Pursuant to Va. Code Ann. § 8.01-261 and § 8.01-262, venue is appropriate in this Court because CHS' headquarters is located in Reston, Virginia, and CHS regularly and/or systematically conducts affairs or business activities in Reston, Virginia.

6.     The Court has jurisdiction over the Young's claim of retaliation in violation of the Florida Whistleblower Protection Act, Florida Statute § 448.102, *et seq.*, ("FWPA") because CHS maintains an office and transacts business at 8810 Astronaut Boulevard, Cape Canaveral, Florida 33920, and Ronald and Ramona Young entered into their respective employment contracts in the State of Florida.

## PARTIES

7.     Plaintiff Ronald Young resides in Mountain Home, Arkansas.

2

8.      Ronald Young is a proper plaintiff for the purposes of FWPA because he is an employee as defined in § 448.101(2) of the Florida Statues.

9.      Plaintiff Ramona Young Resides in Mountain Home, Arkansas.

10.     Ramona Young is a proper plaintiff for the purposes of FWPA because she is an employee as defined in § 448.101(2) of the Florida Statues.

11.     Defendant CHS is a Maryland corporation and it maintains its nerve center and transacts business and 10701 Parkridge Boulevard, Suite 200, Reston, Virginia.

12.     CHS is a proper defendant for the purposes of FWPA because it is an employer as defined in § 448.101(3) of the Florida Statues

## FACTUAL ALLEGATIONS

13.     Ronald Young started working with CHS in July, 2011.

14.     Ramona Young started working for CHS in August, 2011.

15.     Ronald Young has sixteen (16) years of experience as a Registered Nurse ("RN").

16.     Ramona Young has eleven (11) years of experience as a RN.

17.     Ronald Young and Ramona Young each had a one-year employment contract with CHS to serve as Medical Surgery Registered Nurses.

18.     CHS had a contract with the U.S. State Department to provide medical services at medical facilities in Iraq.

19.     CHS stationed Ronald Young and Ramona Young at Sather Air Force Base in Iraq. This is a primary trauma facility where the staff performs about one to three surgeries per month.

20.     Ronald Young arrived at Sather Air Force Base in Iraq on or about September 9, 2011.

3

21.    On or about September 10, 2011, CHS sent Ronald Young to Forward Operating Base ("FOB") Shield to work at the facility with, *inter alia*, Ken Jones.

22.    CHS instructed Ronald Young to return to Sather in or about November 2011 due to CHS' need for his critical care skills.

23.    Ramona Young arrived at Sather in late September/early October 2011.

24.    Ronald Young and Ramona Young were some of the most experienced RNs at Sather because of their medical surgery and critical care skills.

25.    CHS provided no written medical protocols for RNs at Sather at the time of Ronald Young's and Ramona Young's arrival, and Ronald Young and Ramona Young were concerned about the lack of written medical protocols because this negatively affected the level of care CHS was able to provide to its patients.

26.    Accordingly Ronald Young and Ramona Young sent multiple emails to CHS management reporting the lack of written medical protocols.

27.    In response Heidi Cox, CHS' Director of International Operations, asked Ronald Young and Ramona Young to give her a month to address the lack of written protocols.

28.    On or about December 3, 2011, Ronald Young and Ramona Young witnessed CHS Critical Care Practitioner Lindsey Brock sedate a patient ("Patient One") and intubate him without his consent.

29.    Intubation is the placement of a flexible plastic or rubber tube into the trachea to maintain an open airway or to serve as a conduit through which to administer certain drugs. It is frequently performed in critically injured, ill or anesthetized patients to facilitate ventilation of the lungs, including mechanical ventilation, and to prevent the possibility of asphyxiation or airway obstruction.

4

30.     Patient One questioned Brock and protested until he was fully sedated.

31.     During the intubation procedure, Brock was having difficulty moving the tube through Patient One's airway. As a result, the patient aspirated fluid into his lungs.

32.     On or about December 4, 2011, Ronald Young and Ramona Young requested a quality review of Patient One's care; however, CHS Staff Manager Tom Nagel refused Ronald Young's and Ramona Young's request.

33.     Patient One subsequently died.

34.     CHS staff commenced to shun and exclude Ronald Young and Ramona Young after they had questioned Brock's care of this patient.

35.     On or about December 18, 2011, another patient ("Patient Two") arrived at the hospital. Patient Two was unresponsive and the Intensive Care Unit staff placed him on a ventilator.

36.     Due to the severity of Patient Two's injuries and his unresponsive state, CHS's Ethics Board met to discuss the possibility of withdrawing care. However, as Brock attempted to place a central line during the course of treatment for Patient Two, Patient Two responded to the pain.

37.     Despite the response of Patient Two to the pain of the procedure, Brock told the CHS nurses to withdraw care, stating that the patient would be dead soon.

38.     Moreover, Brock directed the nurses to stop charting Patient Two's vital signs and only prescribed morphine for the pain. Despite Brock's instructions, however, Ronald Young and Ramona Young continued to chart the patient's vital signs. About four hours later, Patient Two opened his eyes and was responding to simple commands.

39.     Although Ronald Young and Ramona Young called Brock to see Patient Two's improved condition, Brock reiterated her belief that Patient Two would die soon. Accordingly, Ronald Young and Ramona Young requested a quality review of Patient Two's care, and Paul DeVane, CHS' Director of Public Health and Quality Assurance, reluctantly agreed.

40.     The next day, on or about December 19, 2011, Brock continued to encourage the nurses to push morphine and told the nurses there was no need to chart Patient Two's vital signs. Although Patient Two had a high fever, Brock refused to give Patient Two additional medication.

41.     Later on or about December 19, 2011, CHS convened an Ethics Committee to review Patients Two's care. Ronald Young stated that Brock had been too quick to withdraw care from Patient Two. The committee was hostile towards Ronald Young and Ramona Young, and DeVane raised his voice to Ronald Young and Ramona Young several times.

42.     On or about December 20, 2011, DeVane told Ronald Young and Ramona Young that the Ethics Committee had decided that the "solution to the problem" would be to have Ronald Young and Ramona Young work separate shifts.

43.     DeVane also told Ronald Young and Ramona Young that they were free to resign if they would not work separate shifts.

44.     Ronald Young requested a meeting with DeVane's supervisor at CHS, Casper Jones, but Casper Jones did not take any action.

45.     After Ronald Young received no response from Casper Jones, Ronald Young complained to CHS Director Heidi Cox. Ronald Young also contacted Dr. Mark Cohen at the U.S. State Department to report the substandard care being provided by CHS at Sather under the State Department contract.

6

46.    Director Cox agreed to speak with Ronald Young and Ramona Young on or about December 22, 2011, after the Youngs had complained to the State Department about the substandard medical care being provided at Sather.

47.    However, when Ronald Young and Ramona Young came to the hospital for the teleconference, Nurse Manager James Spivey informed Ronald Young and Ramona Young that they had to leave the facility. Bradley Williams then invited Ronald Young and Ramona Young into his office for the teleconference.

48.    CHS put Ronald Young and Ramona Young on paid administrative leave following the teleconference, and Director Cox informed Ronald Young and Ramona Young to leave the hospital and set a departure date from Iraq on or about December 24, 2011. Edie Widener, from CHS' Human Resources department, instructed Ronald Young and Ramona Young not to speak to any of their coworkers in the interim.

49.    Ronald Young and Ramona Young returned to the United States on December 24, 2011, but CHS did not return all of Ronald Young and Ramona Young's belongings including some of Ramona Young's medications.

50.    Ronald Young sent several emails complaining to Widener about the substandard care being provided by CHS at Sather and their unfair treatment by CHS.

51.    On or about January 23, 2012, Ronald Young spoke to Cox and Widener. Widener informed Ronald Young that CHS had investigated Brock and found nothing wrong with Brock's practices. Widener then said that to Ronald Young that it was her understanding that Ronald Young and Ramona Young refused to work separate shifts. Ronald Young responded that he and Ramona Young would work separate shifts or even go to separate work

7

sites. Widener told Ronald Young that CHS had a new policy stating that a husband and wife cannot work together on the same shift.

52.     On or about January 30, 2012, Ronald Young and Ramona Young had a teleconference with Widener, Casper Jones, and Cox, and in this teleconference CHS terminated Ronald Young and Ramona Young's employment.

53.     As the result of the foregoing, Ronald Young and Ramona Young each suffered substantial economic damages, damages to their professional reputations, and mental anguish and consternation.

**Count I**
**Wrongful Discharge**
**Common Law consistent with the rule in *Bowman***
**and the public policy articulated in Va. Code Section 63.2-1606, *et seq.***

54.     Plaintiffs Ronald Young and Ramona Young hereby incorporate the allegations set forth in the foregoing paragraphs as though fully alleged herein.

55.     The Virginia public policy exception to the at-will employment doctrine makes it unlawful for an employee to discharge an employee if that employee's termination contravenes public policy embodied in Virginia's statues. See Bowman, 229 Va. 534, 331 S.E.2d 797.

56.     The Supreme Court of Virginia has recognized a cause of action for wrongful discharge under Bowman for an employee's refusal to engage in criminal conduct. See Rowan v. Tractor Supply Co., 263 Va. 209, 214, 59 S.E.2d 709, 711 (Va. 2002).

57.     The Virginia Legislature has recognized the existence of "Standard of Ethics" in Va. Code Ann. § 54.1-3007, which prescribes refusal, revocation or suspension of licenses where a licensee has practiced "in a manner contrary to the standards of ethics" or in such a manner as to make his practice a danger to the health and welfare of patients or to the public.

8

58.     Not only did CHS lack written medical protocols, the Youngs witnessed reprehensible medical practices that placed the health and welfare of patients in danger and were contrary to the standard of ethics recognized by the Virginia Legislature.

59.     During an unconsented intubation procedure in or about December 2011, Brock had difficulty moving the tube through Patient One's airway. As a result, Patient One aspirated fluid into his lungs.

60.     On or about December 4, 2011, Ronald Young and Ramona Young requested a quality review of Patient One's care; however, CHS Staff Manager Nagel refused the Youngs' request, and Patient One subsequently died.

61.     Furthermore, on or about December 18, 2011, Patient Two began to show signs of awareness but Brock instructed CHS nurses to withdraw care, stating that the patient would be dead soon.

62.     Brock even directed the nurses to stop charting Patient Two's vital signs and only prescribed morphine for the pain. Eventually Patient Two opened his eyes and was responding to simple commands, yet Brock reiterated her belief that Patient Two would die soon.

63.     Again, the Youngs requested a quality review of Patient Two's care, and DeVane reluctantly agreed. During that quality review Ronald Young explained that it was improper for Brock withdraw care from Patient Two so quickly.

64.     Despite this, on or about December 19, 2011, Brock encouragee the nurses to push morphine and told the nurses there was no need to chart Patient Two's vital signs and refused to give Patient Two medication for a high fever.

65.     Ronald Young and Ramona Young reported to CHS and the U.S. State Department CHS' failure to provide the required standard of care to patients at Sather as they

9

were concerned that CHS was requiring them to practice in a manner contrary to the standards of ethics and in such a manner as to make the practice a danger to the health and welfare of its patients.

66.     In reprisal for the Youngs' reporting actions, CHS took adverse actions against Ronald Young and Ramona Young by placing them on administrative leave, refusing to return their belongings, and terminating their employment.

67.     As the result of the foregoing the Plaintiffs suffered damages.

## COUNT II
### Florida Whistleblower Protection Act
### Florida Statute §448.102, *et seq.*
### Retaliation

68.     Plaintiffs Ronald Young and Ramona Young hereby incorporate the allegations set forth in the foregoing paragraphs as though fully alleged herein.

69.     Ronald Young and Ramona Young reported to CHS and the U.S. State Department CHS' violation of law in failing to provide the required standard of care to patients at Sather.

70.     CHS' termination Ronald Young and Ramona Young was motivated in whole or in part because of Ronald Young and Ramona Young's reports of actual violations of law to the State Department and for refusing to engage in continuing illegal conduct as refusing to take a sick patient's vital signs or to complete charting efforts.

71.     In reprisal CHS took adverse actions against Ronald Young and Ramona Young by placing them on administrative leave, refusing to return their belongings, and terminating their employment.

72.     As the result of the foregoing the Plaintiffs suffered damages.

10

## PRAYER FOR RELIEF

WHEREFORE, Ronald Young and Ramona Young pray this Honorable Court for judgment against the Defendant in, but not limited to, compensatory damages, punitive damages, liquidated damages as well as interest on the monies due and owing, compensatory damages, injunctive relief, reinstatement to the same positions held before the retaliatory personnel action, or to an equivalent position, reinstatement of full fringe benefits and seniority rights, and reasonable attorney's fees, court costs, and expenses.

## JURY DEMAND

Ronald Young and Ramona Young demand a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,

R. Scott Oswald, Esq.
Virginia Bar No. 41770
Nicholas Woodfield, Esq.
Virginia Bar No. 48938
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, NW
Suite 900
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
*Attorneys for Plaintiff*

11

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

RONALD P. YOUNG and          )
RAMONA YOUNG,                )
                             )
              Plaintiffs,    )
                             )     CASE NO. 1:12-cv-1202 (GBL-JFA)
        v.                   )
                             )
CHS MIDDLE EAST, LLC,        )
                             )
              Defendant.     )

## ORDER

THIS MATTER is before the Court on Plaintiffs' Second Motion to Remand to State Court. (Dkt. No. 25.) The basis of Plaintiffs' Motion is a lack of diversity between the parties. As stated in open court on Friday, January 18, 2013, the Court **GRANTS** Plaintiffs' Motion. The Court finds that Plaintiffs have sufficiently established, with evidence of state government filings and public business records, that CHS International's principal place of business, is located in Reston, Virginia. As a result, the Court finds that CHS International is citizen of Virginia for diversity purposes and that remand to Virginia state court is appropriate.

Defendant's evidence regarding the location of its principal place of business lacks sufficient credibility to rebut Plaintiffs' challenge to diversity of citizenship. Defendant submitted no documentary evidence, other than its own self-serving affidavits and the deposition transcript of one of its managers and directors, in an attempt to establish that the "nerve center" or central locus of control and direction of CHS International, the sole corporate member of CHS Middle East, LLC, is located in the State of Florida. Specifically, Defendant produced no bank records, business stationary, business cards, or any other business-related document listing a Florida business address, which substantiates its representation that its "nerve center" is located

in Florida, and notably, Defendant concedes that it is not even registered to do business in Florida. For these reasons, the Court finds that Defendant's self-serving evidence, which appears to be prepared in anticipation of this litigation, lacks credibility and is therefore insufficient to rebut Plaintiffs' evidence. Accordingly, it is hereby

**ORDERED** that Plaintiffs' Motion is **GRANTED**. It is further

**ORDERED** that this case is **REMANDED** to the Circuit Court of Fairfax County, Virginia. It is further

**ORDERED** that Defendant's Motion to Dismiss Complaint (Dkt. No. 5.) is **DENIED as** moot.

The Clerk is directed to forward a copy of this Order to counsel of record.

**IT IS SO ORDERED.**

ENTERED this _____ day of January, 2013.

Alexandria, Virginia
01/__/13

_____ /s/ _____
Gerald Bruce Lee
United States District Judge

VIRGINIA:

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Young, et al.
  Plaintiff/Complainant,

                                    Chancery/Law No. 2012-13764

v.

CAS Middle East
  Defendant.

## ORDER

This matter came to be heard on the 22 day of MARCH 2013 on the
Plaintiff(s)/Complainant(s)/Defendant(s)'s motion DEMURRER

Upon the matters presented to the Court it is hereby

ORDERED as follows:
DEFENDANT'S DEMURRER IS GRANTED WITH PREJUDICE AS
TO COUNT II OF THE COMPLAINT (FLORIDA WHISTLEBLOWER
PROTECTION ACT) AND IS GRANTED WITH LEAVE TO AMEND
AS TO COUNT I (WRONGFUL DISCHARGE COMMON LAW CONSISTENT
WITH THE RULE IN BOWMAN v STATE BANK OF KEYSVILLE 229 VA 534 (1985)
AND DEFENDANT PLAINTIFF IS GRANTED 21 DAYS TO FILE AN
AMENDED COMPLAINT, AND IF NO AMENDED COMPLAINT IS FILED
WITHIN 21 DAYS, DISMISSAL OF COUNT I SHALL BE WITH PREJUDICE

ENTERED this 22nd day of March, 2013

                                     Judge

SEEN and Objected.

Counsel for Plaintiff/Complainant

SEEN and NOT OBJECTED TO

Carlos M. Recio
Counsel for Defendant

# ORIGINAL

**VIRGINIA:**

### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| RONALD P. YOUNG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 2012-13754** |
| | ) | |
| CHS MIDDLE EAST, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### FIRST AMENDED COMPLAINT

1.     Defendant CHS Middle East, LLC ("Defendant" or "CHS") illegally terminated Ronald Young and Ramona Young ("Plaintiffs" or "Mr. Young" and "Mrs. Young") because they reported their concerns about the lack of written protocols and substandard care being provided to patients at Sather Air Force Base ("Sather AFB"), Iraq to CHS management and U.S. Department of State officials.  The Plaintiffs witnessed and reported conditions that they reasonably believed prevented the Defendant from meeting its obligations to the government and that Defendant was therefore presenting false claims for its contracted services.  By terminating Plaintiffs for their disclosures to CHS management and U.S. Department of State officials, CHS violated the False Claims Act's anti-retaliation provision, codified at 31 U.S.C. § 3730(h).

2.     Sather AFB changed its name in or around December 2011 to the Baghdad Diplomatic Support Hospital when the base changed from U.S. Department of Defense to U.S. Department of State control.

### JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over Defendant pursuant to Va. Code Ann. § 17.1-514.

4.      Both Plaintiffs' employment agreements with Defendant specify that the Commonwealth of Virginia courts shall have exclusive jurisdiction and venue over any proceeding arising from or related to this employment agreement.

5.      Pursuant to Va. Code Ann. § 8.01-261 and § 8.01-262, venue is appropriate in this Court because Defendant's headquarters is located in Reston, Virginia, and Defendant regularly and/or systematically conducts affairs or business activities in Reston, Virginia.

<u>**PARTIES**</u>

6.      Plaintiff Ronald Young resides in Mountain Home, Arkansas.

7.      Plaintiff Ramona Young Resides in Mountain Home, Arkansas.

8.      Defendant CHS is a Maryland corporation that maintains its nerve center and transacts business at 10701 Parkridge Boulevard, Suite 200, Reston, Virginia.

<u>**FACTUAL ALLEGATIONS**</u>

9.      Ronald Young started working for CHS in July, 2011.

10.     Ramona Young started working for CHS in August, 2011.

11.     Ronald Young has seventeen (17) years of experience as a Registered Nurse ("RN").

12.     Ramona Young has twelve (12) years of experience as a RN.

13.     Defendant had a $61.5 million contract with the U.S. State Department to provide medical services at medical facilities in Iraq.

14.     Specifically, the contract provides that Defendant must:

- Ensure that the HCPs are properly trained and certified prior to arrival in theater and that they stay proficient while providing health care.

15.     Plaintiffs each signed one-year employment contracts with Defendant to serve as Medical Surgery Registered Nurses.

2

16.     Defendant stationed Plaintiffs at Sather AFB in Iraq, a primary trauma facility where the staff performs about one to three surgeries each month.

17.     Mr. Young arrived at Sather AFB in Iraq on or about September 9, 2011.

18.     On or about September 10, 2011, Defendant sent Mr. Young to Forward Operating Base ("FOB") Shield to work at the facility with, *inter alia,* Ken Jones.

19.     At FOB Shield, Mr. Young discovered that the base did not have and standard operating procedures, directives, or protocols.

20.     Mr. Young alerted his supervisors to the absence of standard operating procedures, directives or protocols and asked Defendant to provide such documents.

21.     Mr. Young's supervisors informed him that they would provide standard operating procedures, directives, and protocols, but never did.

22.     Mrs. Young arrived at Sather AFB on or about October 28, 2011.

23.     At Sather AFB, Mrs. Young discovered there were no clear standard operating procedures, directives, or protocols for employee responsibilities, work shifts, or reporting hierarchy.

24.     Defendant transferred Mr. Young back to Sather AFB on or about November 6, 2011 due to Defendant's need for his critical care skills.

25.     Plaintiffs were two of the most experienced RNs at Sather AFB because of their medical surgery and critical care skills.

26.     Plaintiffs allege that the absence of written medical protocols caused the level of care Defendant provided to its patients to be so deficient that Defendant could not deliver the services for which the government contracted and paid.

3

27.     After Mr. Young's transfer to Sather AFB, he and Mrs. Young requested clear standard operating procedures, directives and protocols from the facility's Nurse Manager, Jim Spivey.

28.     Spivey never provided written guidelines and instead verbally gave *ad hoc* instructions.

29.     Plaintiffs also complained to CHS' Director of International Operations, Heidi Cox.

30.     In response, Cox and Plaintiffs had a telephone conference on or about November 29, 2011. During the call, Cox told Plaintiffs they were being good patient advocates and asked Plaintiffs to give her a month to address the lack of written protocols. Cox never took any action.

**Patient One Dies**

31.     On or about December 3, 2011, Plaintiffs witnessed CHS Critical Care Nurse Practitioner Lindsey Brock sedate a patient ("Patient One") and intubate him without his consent.

32.     Intubation is the placement of a flexible plastic or rubber tube into the trachea to maintain an open airway or to serve as a conduit through which to administer certain drugs. It is frequently performed in critically injured, ill, or anesthetized patients to facilitate ventilation of the lungs, including mechanical ventilation, and to prevent the possibility of asphyxiation or airway obstruction.

33.     Patient One questioned Brock and protested until he was fully sedated.

34.     During the intubation procedure, Brock was having difficulty moving the tube through Patient One's airway. As a result, the patient aspirated fluid into his lungs.

4

35.     As a nurse practitioner, Brock was not qualified to intubate Patient One without a certified registered nurse anesthetist ("CRNA") or anesthesiologist being present.

36.     On or about December 4, 2011, Plaintiffs requested a quality review of Patient One's care; however, CHS Staff Manager Tom Nagel refused Plaintiffs' request.

37.     When Nagel refused to convene a quality review panel, Plaintiffs approached Spivey who did set up a review panel, but it was ultimately cancelled.

38.     Patient One subsequently died.

39.     Plaintiffs requested a quality review of Patient One's treatment from Spivey, Nagel, CHS' Director of Public Health and Quality Assurance Paul DeVane, and DeVane's supervisor, Casper Jones, all to no avail.

40.     After Plaintiffs whistleblowing regarding Patient One, Defendant's staff commenced to shun and exclude Plaintiffs after they had questioned Brock's treatment of Patient One.

**Defendant Retaliates and Patient Two Died**

41.     Nagel told Plaintiffs that since they were working twelve-hour shifts seven days a week, they were allowed to take care of personal tasks, like laundry, while on duty as long as one nurse was in the facility at all times.

42.     One day, Mrs. Young stayed in her personal quarters with a sinus infection while Mr. Young was in the facility on duty.  Despite Nagel's earlier assurances, Plaintiffs received an email from Spivey threatening to dock both their pay for missing work.  This was not a facility-wide threat being made; it was directed only at Plaintiffs.

43.     On December 12, 2011, Mr. Young sent Spivey and Nagel an email asking about the status of Defendant providing standard operating procedures and protocols.

44.     On December 13, 2011, Mr. Young sent Spivey another email asking about protocols for specific procedures, and the quality review for Patient One.

45.     On or about December 18, 2011, another patient ("Patient Two") arrived at the hospital. Patient Two was unresponsive and the Intensive Care Unit staff placed him on a ventilator.

46.     Due to the severity of Patient Two's injuries and his unresponsive state at intake, CHS's Ethics Board planned to meet to discuss the possibility of withdrawing care.

47.     In the interim, Brock made several unsuccessful attempts to place a central line in Patient Two's wrist. Unable to properly place the needle in a vein, she attempted to place the needle in the femoral artery in Patient Two's leg, but was ultimately unsuccessful there, too. During the course of treatment for Patient Two, Patient Two responded to the pain.

48.     Despite the response of Patient Two to the pain of the procedure, Brock told the CHS nurses to withdraw care, stating that Patient Two would be dead soon.

49.     Moreover, Brock directed the nurses to stop charting Patient Two's vital signs and only prescribed morphine for the pain.

50.     Despite Brock's instructions, Plaintiffs continued to chart Patient Two's vital signs. About four hours later, Patient Two opened his eyes and was responding to simple commands.

51.     Although Plaintiffs called Brock to see Patient Two's improved condition, Brock reiterated her belief that Patient Two would die soon. Accordingly, Plaintiffs requested a quality review of Patient Two's care, and DeVane, CHS' Director of Public Health and Quality Assurance, reluctantly agreed.

6

52.    The next day, on or about December 19, 2011, Brock continued to encourage the nurses to push morphine and told the nurses there was no need to chart Patient Two's vital signs. Although Patient Two had a high fever, Brock refused to give Patient Two additional medication.

53.    As an emergency facility, Sather AFB staff should have stabilized and transported Patient Two to a higher care facility, not simply push morphine and default into hospice or palliative care. By providing hospice rather than emergency care, Defendant failed to deliver on the terms of its contract with the government.

54.    In the event that stabilization was not possible, the decision to withdraw care should have been made in consultation with a neurologist and Patient Two's family. By failing to follow proper care withdrawal protocols, Defendant failed to deliver on the terms of its contract with the government.

55.    Patient Two subsequently died.

56.    Later on, about December 19, 2011, CHS convened an Ethics Committee to review Patients Two's care. Mr. Young stated that Brock had been too quick to withdraw care from Patient Two. The committee was hostile toward Plaintiffs, and DeVane raised his voice to Plaintiffs several times.

57.    On or about December 20, 2011, DeVane told Plaintiffs that the Ethics Committee had decided that the "solution to the problem" would be to have Plaintiffs work separate shifts.

58.    DeVane also told Plaintiffs that they were free to resign if they would not work separate shifts.

7

59.     Mr. Young requested a meeting with DeVane's supervisor at CHS, Casper Jones, but Jones did not take any action.

60.     Plaintiffs later learned that DeVane had convened a conference call with staff an hour before he spoke with Plaintiffs and told the staff that Plaintiffs would not stay if Defendant put them on separate shifts.

61.     After the conversation with DeVane, Mr. Young contacted the U.S. Department of State Medical Director Dr. Mark Cohen, to report the substandard care being provided by Defendant at Sather AFB under the State Department contract.

62.     Plaintiffs also wrote emails to CHS executive Gary Palmer, and CHS Director Cox.

63.     Cox agreed to speak with Plaintiffs on or about December 22, 2011, after Plaintiffs had complained to the State Department about the substandard medical care being provided at Sather AFB.

64.     However, when Plaintiffs arrived at the hospital for the teleconference, Nurse Manager James Spivey informed Plaintiffs that they had to leave the facility.

65.     Another CHS employee, Bradley Williams, then invited Plaintiffs into his office for the teleconference.

66.     The teleconference took two hours and resulted in Defendant putting Plaintiffs on paid administrative leave.

67.     During the teleconference Cox informed Plaintiffs that they were banned from the hospital and set a departure date from Iraq for December 24, 2011.

68.     Edie Widener, from CHS' Human Resources department, instructed Plaintiffs not to speak to any of their coworkers in the interim.

69. Plaintiffs returned to the United States on December 24, 2011, but Defendant did not return all of Plaintiffs' belongings including some of Mrs. Young's medications.

70. Mr. Young sent several emails complaining to Widener about the substandard care being provided by Defendant at Sather AFB and their unfair treatment by Defendant.

71. On or about January 23, 2012, Plaintiffs spoke to Cox and Widener. Widener informed Plaintiffs that Defendant had investigated Brock and found nothing wrong with Brock's practices. Widener then informed Plaintiffs that it was her understanding that Plaintiffs refused to work separate shifts. Mr. Young responded that he and Mrs. Young needed their jobs and would be willing to work separate shifts or even go to separate work sites.

72. Widener told Mr. Young that CHS had a new policy stating that a husband and wife cannot work together on the same shift, and she would research the situation and respond soon.

73. On or about January 30, 2012, Plaintiffs had a teleconference with Widener, Casper Jones, and Cox. During the teleconference, Defendant terminated Plaintiffs' employment.

74. As the result of the foregoing, Plaintiffs each suffered substantial economic damages, damages to their professional reputations, pain and suffering, and mental anguish and consternation.

**COUNT I**
**False Claims Act, 31 U.S.C. § 3730(h)**
**Retaliation**

75. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though fully alleged herein.

76.     The False Claims Act, 31 U.S.C. § 3730(h), prohibits Defendant from retaliating against employees who engage in protected conduct by taking lawful actions in furtherance of an FCA claim or by making efforts to stop one or more violations of the FCA.

77.     An employee need not actually file a *qui tam* suit or even know about the protections of Section 3730(h) to qualify for protection under the retaliation provisions of the FCA.

78.     An employee who characterizes the employer's conduct as illegal or fraudulent or who tries to stop a false claim from being made engages in protected conduct.

79.     Mr. Young engaged in protected conduct when he alerted his supervisors about the lack of standard operating procedures, directives or protocols and asked Defendant to provide such documents at FOB Shield.

80.     Plaintiffs complained to Defendant because the United States' government contracted with Defendant to provide quality care to U.S. service members, contractors, and the like, and that instead Defendant delivered substandard care that did not meet the quality and standard of medical services the State Department was paying for, and that people were being injured and dying as a result.

81.     Plaintiffs together engaged in protected conduct when they requested clear standard operating procedures, directives, and protocols from Sather AFB's Nurse Manager, Jim Spivey.

82.     Plaintiffs engaged in protected conduct when they reported the lack of standard operating procedures, directives, and protocols to CHS' Director of International Operations, Heidi Cox first over email, and then during the November 29, 2011 telephone conference.

10

83.     Plaintiffs engaged in protected conduct on or about December 4, 2011, when they requested a quality review of Patient One's care from Tom Nagel.

84.     Plaintiffs engaged in protected conduct after Nagel refused to convene a quality review panel, and Plaintiffs approached Spivey.

85.     Plaintiffs engaged in protected conduct when they requested a quality review of Patient One's treatment from CHS' Director of Public Health and Quality Assurance Paul DeVane, and DeVane's supervisor Casper Jones.

86.     Plaintiffs engaged in protected conduct on December 12, 2011, when Mr. Young sent Spivey and Nagel an email asking about the status on Defendant providing standard operating procedures and protocols.

87.     Plaintiffs engaged in protected conduct on December 13, 2011, when Mr. Young sent Spivey yet another email asking about protocols for specific procedures, and the quality review for Patient One.

88.     Plaintiffs engaged in protected activity when, despite Brock's instructions, Plaintiffs continued to chart Patient Two's vital signs.

89.     Plaintiffs engaged in protected activity when they requested a meeting with Casper Jones, to discuss DeVane's retaliatory actions against them.

90.     Plaintiffs engaged in protected activity when they contacted the U.S. Department of State Medical Direction, Dr. Mark Cohen, to report the substandard care being provided by Defendant at Sather AFB under the State Department contract.

91.     Plaintiffs engaged in protected activity when they wrote emails to CHS executive Gary Palmer, and CHS Director Cox about the substandard care and retaliation they experienced after Defendant placed them on administrative leave.

11

92.    Plaintiffs engaged in protected activity while on administrative leave when they sent several emails complaining to Widener about the substandard care being provided by Defendant at Sather AFB and their unfair treatment by Defendant.

93.    Plaintiffs suffered adverse employment actions when Defendant, *inter alia*:

    a.   threatened to dock the Plaintiffs pay;

    b.   shunned the Plaintiffs by ignoring their requests for standard operating procedures and quality reviews;

    c.   yelled and screamed at Plaintiffs during a quality review on the care of Patient Two;

    d.   refused the Plaintiffs admission to the hospital facility in order to allow them to participate in a previously scheduled teleconference;

    e.   summarily dismissed the Plaintiffs from serving in Iraq and sent them back to the United States;

    f.   withheld Mrs. Young's belongings and medications and refused to return them to her;

    g.   crafted a bogus policy disallowing husband and wife from working together which was specifically designed to prevent these Plaintiffs from working together; and

    h.   terminated the Plaintiffs' employment.

94.    Defendant would not have retaliated against Plaintiffs if Plaintiffs had not engaged in protected activities under the FCA.

12

95.     The Defendant retaliated and took adverse actions against the Plaintiffs as a result of and caused by the many protected activities and instances of whistleblowing that Plaintiffs undertook.

96.     Plaintiffs suffered substantial monetary and non-monetary damages as a direct and proximate result of Defendant's retaliation.

## PRAYER FOR RELIEF

WHEREFORE, and based on the foregoing claims, Plaintiffs respectfully request the following relief:

a.  Reinstatement with the same seniority status, duties, and working conditions applicable at the time of termination, and abatement of the retaliatory conduct directed toward them, or alternatively, front pay or other equitable relief;

b.  Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination;

c.  Special damages, including but not limited to, damages for mental and emotional distress and harm to reputation;

d.  Costs and reasonable attorneys' fees; and

e.  Any other legal and equitable relief this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all claims on which they have the right to a jury trial.

13

RONALD YOUNG
RAMONA YOUNG
By Counsel

_____
Nicholas Woodfield
VSB# 48938
R. Scott Oswald
VSB# 41770
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
*Counsel for the Plaintiffs*

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 12, 2013, I filed the foregoing with the Clerk of

Court via courier, and sent copies by First Class and electronic mail to the following:

Carlos M. Recio, Esq.
Virginia Bar No. 24572
1016 7the Street, SE
Washington, D.C. 20003
*Counsel for Defendant CHS Middle East, LLC*

Michael A. Sexton
Georgia Bar No. 636489
Weinberg, Wheeler, Hudgens, Gunn & Dial, LLC
3344 Peachtree Road, NE, Suite 2400
Atlanta, Georgia 30326
*Counsel for Defendant CHS Middle East, LLC*

Nicholas W. Woodfield

15