IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **RONALD P. YOUNG,** *et al.***,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:13-CV-00585 GBL/JFA |
| ) | |
| **CHS MIDDLE EAST, LLC** ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFFS' OPPOSITION TO
DEFENDANT CHS MIDDLE EAST, LLC'S MOTION TO DISMISS**

Plaintiffs Ronald Young and Ramona Young plead facts in their First Amended Complaint sufficient to support their claim of retaliation in violation of the False Claims Act. Defendant CHS Middle East, LLC violated the False Claims Act by threatening, harassing, and ultimately terminating Plaintiffs in retaliation for Plaintiffs activities in furtherance of a *qui tam* and efforts to stop Defendant from violating the FCA, and Defendant's Motion to Dismiss relies on cases that *predate* the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub.L. No. 111-21, which significantly expanded the scope of the FCA's retaliation provisions.[1] Defendant thus errantly relies on stale jurisprudence as the basis for its motion.

---

[1] Indeed, almost all of the key cases Defendant relies on were either decided before the 2009 FERA amendments passed, or analyzed actions that took place before it did, including *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 342 (4th Cir. 2010) (complaint filed June 11, 2008); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (complaint filed in 2007); *U.S. ex rel Martinez v. Virginia Urology Ctr., P.C.*, 3:09-CV-442, 2010 WL 3023521 (E.D. Va. July 29, 2010) (construing an allegedly retaliatory termination that occurred on July 16, 2007); *Zahodnick v.IBM Corp.,* 135 F.3d 911 (4th Cir. 1997).

The Plaintiffs witnessed and reported conditions that they reasonably believed prevented the Defendant from meeting its obligations to the government and that Defendant was therefore presenting false claims for its contracted services.  By terminating Plaintiffs for their disclosures to Defendant's management and U.S. Department of State officials, Defendant violated the False Claims Act's anti-retaliation provision, codified at 31 U.S.C. § 3730(h).  Defendant's motion to dismiss should be denied.

## STATEMENT OF FACTS

Plaintiffs Ronald Young and Ramona Young began working for CHS in July and August of 2011 respectively.  First Amended Complaint ("FAC"), ¶¶ 9, 10.  Mr. Young has seventeen years of experience as a Registered Nurse; Mrs. Young has twelve (12).  *Id.*, ¶¶ 11, 12.  Defendant had secured a $61.5 million contract with the State Department to provide medical services at facilities in Iraq.  *Id.*, ¶ 13.  Specifically, the contract provided that Defendant must "ensure that the [health care providers] are certified prior to arrival in theater and that they stay proficient while providing health care."  *Id.*, ¶ 14.

Plaintiffs each signed one-year employment contracts with CHS to serve as Medical Surgery Registered Nurses.  *Id.*, ¶ 15.  By September 10, 2011, Mr. Young was stationed at Forward Operating Base ("FOB") Shield.  *Id.*, ¶ 18.  At FOB Shield, Mr. Young discovered that the base did not abide by any standard operating procedures, directives, or protocols, so he alerted his supervisors and asked them to provide such documents.  *Id.*, ¶¶ 19, 20.  Mr. Young's supervisors agreed to provide standard operating procedures, directives, and protocols, but never did.  *Id.*, ¶ 21.

Mrs. Young arrived at Sather Air Force Base ("AFB") on or about October 28, 2011. *Id.*, ¶ 22. Mrs. Young discovered that there were no no clear standard operating procedures, directives, or protocols for employee responsibilities, work shifts, or reporting hierarchy at Sather AFB, either. *Id.*, ¶ 23. By early November, Sather AFB was in need of another nurse with critical care skills so Defendant transferred Mr. Young from FOB Shield, back to Sather AFB. *Id.*, ¶ 24. Although Plaintiffs' medical surgery and critical care skills made them two of the most experienced RNs at Sather AFB, without written protocols Defendant's patient care was so deficient that CHS could not deliver the services it had contracted with the government to provide. *Id.*, ¶ 25, 26.

While at Sather AFB, the facility's Nurse Manager, Jim Spivey, never provided written guidelines and instead verbally gave *ad hoc* instructions. *Id.*, 27, 28. Plaintiffs asked Spivey for clear, standard operating procedures, directives and protocols, but he never provided them. *Id.*, ¶ 27, 28. Plaintiffs also complained to CHS' Director of International Operations, Heidi Cox. *Id.*, ¶ 29. In response, Cox and Plaintiffs held a telephone conference on or about November 29, 2011. During the call, Cox told Plaintiffs they were being good patient advocates and asked for a month to address the lack of written protocols. Cox never took any action. *Id.*, ¶ 30.

On or about December 3, 2011, Plaintiffs witnessed CHS Critical Care Nurse Practitioner Lindsey Brock sedate a patient ("Patient One") and intubate him without his consent. *Id.*, ¶ 31. As a nurse practitioner, Brock was not qualified to intubate Patient One without a certified registered nurse anesthetist ("CRNA") or anesthesiologist being present. *Id.*, ¶ 35. During the intubation procedure, Brock was having difficulty moving the tube through Patient One's airway. As a result, the patient aspirated fluid into his lungs. *Id.*, ¶ 34. Patient One questioned Brock and protested until he was fully sedated. *Id.*, ¶ 33.

On or about December 4, 2011, Plaintiffs requested a quality review of Patient One's care; however, CHS Staff Manager Tom Nagel refused Plaintiffs' request. *Id.*, ¶ 36. When Nagel refused to convene a quality review panel, Plaintiffs approached Spivey who did set up a review panel, but it was ultimately cancelled. *Id.*, ¶ 37. Plaintiffs requested a quality review of Patient One's treatment from Spivey, Nagel, CHS' Director of Public Health and Quality Assurance Paul DeVane, and DeVane's supervisor, Casper Jones, all to no avail. *Id.*, ¶ 39. Patient One subsequently died. *Id.*, ¶ 38.

After Plaintiffs' whistleblowing regarding Patient One, Defendant's staff shunned and excluded Plaintiffs. *Id.*, ¶ 40. For example, Nagel told the nursing staff that since they were working twelve-hour shifts seven days a week, they were allowed to take care of personal tasks, like laundry, while on duty as long as one nurse was in the facility at all times. *Id.*, ¶ 41. Even so, one day when Mrs. Young stayed home with a sinus infection while Mr. Young went to work, Plaintiffs received an email from Spivey threatening to dock both their pay for missing work. This was not a facility-wide threat being made; it was directed only at Plaintiffs. *Id.*, ¶ 42.

On December 12, 2011, Mr. Young sent Spivey and Nagel an email asking about the status of Defendant providing standard operating procedures and protocols. *Id.*, ¶ 43. On December 13, 2011, Mr. Young sent Spivey another email asking about protocols for specific procedures, and the quality review for Patient One. *Id.*, ¶ 44.

On or about December 18, 2011, another patient ("Patient Two") arrived at the hospital. Patient Two was unresponsive and the Intensive Care Unit staff placed him on a ventilator. *Id.*, ¶ 45. Due to the severity of Patient Two's injuries, CHS's Ethics Board planned to meet to discuss the possibility of withdrawing care. *Id.*, ¶ 46. In the interim, Brock made several unsuccessful attempts to place a central line in Patient Two's wrist. Unable to properly place the needle in a

vein, she attempted to place the needle in the femoral artery in Patient Two's leg.  She stopped after several failed attempts, but Patient Two responded to the pain.  *Id.*, ¶ 47.

Despite Patient Two's reaction to the painful procedure, Brock told the nurses to withdraw care, stating that Patient Two would be dead soon.  *Id.*, ¶ 48.  Moreover, Brock directed the nurses to stop charting Patient Two's vital signs and only prescribed morphine for the pain.  *Id.*, ¶ 49.  Despite Brock's instructions, Plaintiffs continued to chart Patient Two's vital signs.  About four hours later, Patient Two opened his eyes and was responding to simple commands.  *Id.*, ¶ 50.  Although Plaintiffs called Brock to see Patient Two's alert condition, Brock reiterated her belief that Patient Two would die soon.  Accordingly, Plaintiffs requested a quality review of Patient Two's care, and DeVane, CHS' Director of Public Health and Quality Assurance, reluctantly agreed.[2]  *Id.*, ¶ 51.

The next day, on or about December 19, 2011, Brock continued to encourage the nurses to push morphine and told the nurses there was no need to chart Patient Two's vital signs.  Although Patient Two had a high fever, Brock refused to give Patient Two additional medication.  *Id.*, ¶ 52.  As an emergency facility, Sather AFB staff should have stabilized and transported Patient Two to a higher care facility, not simply push morphine and default into hospice or palliative care.  By providing hospice rather than emergency care, Defendant failed to deliver on the terms of its contract with the government.  *Id.*, ¶ 53.  In the event that stabilization was not possible, the decision to withdraw care should have been made in consultation with a neurologist and Patient Two's family.  By failing to follow proper care withdrawal protocols, Defendant failed to deliver on the terms of its contract with the government.  *Id.*, ¶ 54.

---

[2] The FAC states that Patient 2 died.  While he was further harmed by premature removal of care without any consultation with a qualified neurologist, he was ultimately medevaced to another facility.  The last Plaintiffs were aware, Patient Two did not die but instead sustained significant deficits from the incident.

Later on, about December 19, 2011, CHS convened an Ethics Committee to review Patients Two's care. Mr. Young stated that Brock had been too quick to withdraw care from Patient Two. The committee was hostile toward Plaintiffs, and DeVane raised his voice at Plaintiffs several times. *Id.*, ¶ 56. On or about December 20, 2011, DeVane told Plaintiffs that the Ethics Committee had decided that the "solution to the problem" would be to have Plaintiffs work separate shifts. *Id.*, ¶ 57. DeVane also told Plaintiffs that they were free to resign if they would not work separate shifts. *Id.*, ¶ 58. Mr. Young requested a meeting with DeVane's supervisor at CHS, Casper Jones, but Jones did not take any action. *Id.*, ¶ 59. Plaintiffs later learned that DeVane had held a conference call an hour before he spoke with Plaintiffs and told the staff that Plaintiffs would not stay if Defendant put them on separate shifts. *Id.*, ¶ 60.

After the conversation with DeVane, Mr. Young contacted the U.S. Department of State Medical Director Dr. Mark Cohen, to report the substandard care Defendant was providing at Sather AFB under the State Department contract. *Id.*, ¶ 61. Plaintiffs also wrote emails to CHS executive Gary Palmer, and CHS Director Cox. *Id.*, ¶ 62. Cox agreed to speak with Plaintiffs on or about December 22, 2011, after Plaintiffs had complained to the State Department about the substandard medical care being provided at Sather AFB. *Id.*, ¶ 63. However, when Plaintiffs arrived at the hospital for the teleconference, Nurse Manager James Spivey informed Plaintiffs that they had to leave the facility. *Id.*, ¶ 64. Another CHS employee, Bradley Williams, then invited Plaintiffs into his office for the teleconference. *Id.*, ¶ 65. After a two hour teleconference, Defendant put Plaintiffs on paid administrative leave. *Id.*, ¶ 66.

During the teleconference Cox informed Plaintiffs that they were banned from the hospital and set a departure date from Iraq for December 24, 2011. *Id.*, ¶ 67. Edie Widener, from CHS' Human Resources department, instructed Plaintiffs not to speak to any of their

6

coworkers in the interim. *Id.*, ¶ 68.  Plaintiffs returned to the United States on December 24, 2011, but Defendant did not return all of Plaintiffs' belongings including some of Mrs. Young's medications. *Id.*, ¶ 69.  After returning to the states, Mr. Young sent several emails complaining to Widener about the substandard care being provided by Defendant at Sather AFB and their unfair treatment by Defendant. *Id.*, ¶ 70.

On or about January 23, 2012, Plaintiffs spoke to Cox and Widener.  Widener informed Plaintiffs that Defendant had investigated Brock and found nothing wrong with Brock's practices.  Widener then informed Plaintiffs that it was her understanding that Plaintiffs refused to work separate shifts.  Mr. Young responded that he and Mrs. Young needed their jobs and would be willing to work separate shifts or even go to separate work sites. *Id.*, ¶ 71.  Widener told Mr. Young that CHS had a new policy stating that a husband and wife cannot work together on the same shift, and she would research the situation and respond soon. *Id.*, ¶ 72.  On or about January 30, 2012, Plaintiffs had a teleconference with Widener, Casper Jones, and Cox.  During the teleconference, Defendant terminated Plaintiffs' employment. *Id.*, ¶ 73.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) specifies that a complaint only needs to recite a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  "A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only **allege facts** sufficient to **state** elements of the claim." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) (emphasis in original) (internal quotation marks and citation omitted).  The jurisprudence of this circuit and others has firmly established that the heightened pleading standard for fraud does not apply to FCA complaints.  *See United States ex rel. Elms v. Accenture LLP,* 341 F. App'x 869,

7

873 (4th Cir. 2009)("Unlike the fraud claim, a retaliation claim [under the False Claims Act] is not subject to the heightened pleading standard of Rule 9(b); therefore, plaintiff need only satisfy Rule 8's notice pleading requirements to survive a motion to dismiss."); *United States ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1305 (11th Cir. 2010); *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1103 (9th Cir. 2008); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield,* 472 F.3d 702, 729 (10th Cir. 2006); *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 238 n. 23 (1st Cir. 2004) ("[A] retaliation claim under 31 U.S.C. § 3730(h) does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b)").

A motion to dismiss "should be granted only in very limited circumstances." *Steele v. Motz*, Civil Action No. 1:09CV792, 2009 WL 8131857, at *4 (D. Md. Nov. 19, 2009) (quoting *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989). In evaluating a 12(b)(6) motion, the reviewing court "accept[s] as true all of the complaint's factual allegations," *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993), and gives the plaintiff the benefit of all inferences that can be derived from the facts alleged. *See Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir. 1997), *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10 (2007). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Gard v. U.S. Dep't of Educ.*, 691 F. Supp. 2d 93, 97 (D.D.C. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## ARGUMENT

Defendant correctly states in its brief that in 1986 Congress amended the FCA to include an anti-retaliation provision for whistleblowers. (Def.'s Br. in Supp. of Mot. to Dismiss, docket # 5, page 6). The 1986 language shielded activities "in furtherance of an action" under the FCA. *See* 31 U.S.C § 3730(h)(1)[3]. Defendant, however, fails to address the modifications to the FCA that were implemented by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), which amended the anti-retaliation provisions of the FCA by expanding the field of whistleblower activity that the law protects as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section **or other efforts to stop 1 or more violations of this subchapter**.

31 U.S.C. § 3730(h)(1) (emphasis added).

The FERA amendments expanded the FCA's protections to cover "other efforts to stop 1 or more violations" of the FCA. *Id.* Defendant's brief appears to rely on the pre-FERA language, and fails to reproduce the critical language included with the FERA amendment. (Def.'s Br. in Supp. of Mot. to Dismiss, docket # 5, page 7).

Congress' explicit goal in passing FERA was to counteract court decisions that had narrowed the FCA's retaliation provisions. *See* H.R. Rep. No. 97, 111th Cong., 1st Sess. 5

---

[3] Prior to the FERA amendments, Section 3730(h) mandated that:

> An employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

37 U.S.C. § 3730(h)(2008).

(2009) ("Unfortunately, since the 1986 amendments were enacted, several court decisions have limited the reach of the False Claims Act, jeopardizing billions in Federal funds . . . Since the 1986 amendments, courts have also limited the scope of the False Claims Act's anti-retaliation provisions."); *see also* 1 John T. Boese *Civil False Claims and* Qui Tam *Actions* 2-107 (4th ed., 2011 Supplement) (discussing the Congress' intent to correct "erroneous interpretation[s]" by courts).

Congress drafted FERA in order to expand the definition of protected activity. *See* S. Rep. No. 345, 99th Cong., 2d Sess. 34, reprinted in 1986 U.S.C.C.A.N. 5266. "'[P]rotected activity . . . includes any 'good faith' exercise of an individual 'on behalf of himself or others of any option afforded by this Act, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this act.' . . . Protected activity should . . . be interpreted broadly.") Specifically, Congress included the language protecting "other efforts to stop 1 of more violations" of the FCA in order to:

> make clear that this subsection protects not only steps taken in furtherance of a potential or actual qui tam action, but **also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department** and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance of a potential or actual qui tam action.

155 Cong. Rec. E1295-03 (statement of Rep. Berman) (emphasis added).

To state a claim for 3730(h) retaliation after FERA, Plaintiffs only need to allege that (1) they engaged in activity protected by the statute; (2) their employer knew they engaged in protected activity; and (3) they were discharged because they engaged in protected activity. *See Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 866 (4th Cir. 1999). Without written protocols Defendant's patient care was so deficient that CHS it did not deliver the

services it had contracted with the government to provide, yet Defendant continued to certify to the government that it had complied with the contract and continued to accept federal funds, despite the fact that Defendant's failure to create guidelines and procedures resulted in staff performing procedures they were not certified for or failing to provide care entirely. Plaintiffs witnessed this fraud and complained to Defendant on numerous occasions. Plaintiffs could have contacted a medical ethics board or the press if the quality of care was their sole concern but instead escalated their complaints to the State Department; the agency that Defendant had contracted with. Defendant does not dispute that the activities that Plaintiffs engaged in prompted Defendant's decision to discharge them. Plaintiffs, therefore, have satisfied the elements of a 3730(h) claim, as amended by FERA, and the Defendant's motion to dismiss should be denied.

### A. Plaintiffs Took Actions in Furtherance of a *Qui Tam* and Attempted to Stop FCA Violations

Courts apply a broad standard when analyzing whether a complaint has sufficiently plead the protected activity prong of an FCA retaliation claim. *See Layman v. MET Laboratories, Inc.*, CIV.A. RDB-12-2860, 2013 WL 2237689 (D. Md. May 20, 2013) (citations removed). An individual engages in conduct protected by the FCA whenever she engages in an effort to stop a FCA violation; the act of internal reporting itself suffices as both the effort to stop an FCA violation and the notice to the employer that the employee is engaging in protected activity. *See Manfield v. Alutiiq Int'l Solutions, Inc*., 851 F. Supp. 2d 196, 204 (D. Me. 2012); *see also United States ex. Rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 741 (D.C. Cir. 1998) ("even an investigation conducted without contemplation or knowledge of the legal possibility of a False Claims Act suit can end up being 'in furtherance' of such an action). "Investigatory actions" can

11

rise "to the level of protected activity" regardless of whether or not a *qui tam* action is ever filed. *See, e.g., Eberhardt v. Integrated Design & Const., Inc.,* 167 F.3d 861, 867 (4th Cir.1999).

When the Defendant contracted with the United States government, it accepted money in exchange for medical services. FAC, ¶ 13. Specifically, Defendant promised to ensure that its staff was "properly trained and certified prior to arrival in theater and that they stay proficient while providing health care." FAC, ¶ 13. A facility with no written directives or protocols cannot ensure that its staff is performing procedures for which they are properly certified, nor can the facility ensure that the staff stays proficient while providing health care. Without written directives, Plaintiffs reasonably believed that Defendant was unable to comply with the terms of its contract, and therefore committed fraud against the government. The sad fate of Patient One was a direct result of Brock performing an intubation procedure that she was not certified to do. FAC, ¶ 35. Rather than receiving care from a staffer who was not proficient in the procedure, Patient Two suffered because Defendant provided no medical care at all and prematurely withdrew services. FAC, ¶ 48-54. Plaintiffs' decision to continue charting Patient Two's vital signs even after Brock instructed them to withdraw care, constitutes an act in furtherance of a *qui tam*. FAC, ¶ 50.

Plaintiffs engaged in numerous acts of internal reporting and investigation regarding the overarching problem of Defendant's complete lack of written protocols and the specific harm it was causing its patients, including:

1) When Mr. Young alerted his supervisors to the lack of standard operating procedures, directives or protocols and asked Defendant to provide such documents at FOB Shield. FAC, ¶ 19.

2) When both Plaintiffs requested clear standard operating procedures, directives, and protocols from Sather AFB's Nurse Manager, Jim Spivey. FAC, ¶ 27.

3) When both Plaintiffs reported the lack of standard operating procedures, directives, and protocols to CHS' Director of International Operations, Heidi Cox first over email, and then during the November 29, 2011 telephone conference. FAC, ¶ 29, 30.

4) When both Plaintiffs requested a quality review of Patient One's care from Tom Nagel. FAC, ¶ 36.

5) When Mr. Young again asked Spivey and Nagel for standard operating procedures and protocols. FAC, ¶ 43.

6) When Mr. Young again sent Spivey an email asking about protocols for specific procedures, and the quality review for Patient One. FAC, ¶ 44.

7) When both Plaintiffs continued to chart Patient Two's vital signs. FAC, ¶ 50.

8) When, at an Ethics Committee meeting to review Patients Two's care, Mr. Young spoke out about Brock withdrawing care too quickly form Patient Two. FAC, ¶ 56.

9) When Mr. Young contacted the U.S. Department of State Medical Director Dr. Mark Cohen, to report the substandard care being provided by Defendant at Sather AFB under the State Department contract. FAC, ¶ 61.

10) When they wrote emails to CHS executive Gary Palmer, and CHS Director Cox about the substandard care. FAC, ¶ 62.

11) While on administrative leave when they sent several emails complaining to Widener about the substandard care being provided by Defendant at Sather AFB. FAC, ¶ 70.

On nearly a dozen occasions, Mr. Young and Mrs. Young internally reported or investigated what they reasonably believed were activities that constituted fraud on the

government. They alerted their supervisors, company executives, and authorities within the State Department in furtherance of a *qui tam* and in an effort to stop further FCA violations. Plaintiffs clearly engaged in protected conduct as envisioned by Congress and embraced by the courts since the 2009 FERA amendments.

### B. Plaintiffs' Internal Disclosures Provided Sufficient Notice to Defendant

"[S]ince a plaintiff now engages in protected conduct whenever he engages in an effort to stop an FCA violation, the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer." *Layman v. MET Laboratories, Inc.*, CIV.A. RDB-12-2860, 2013 WL 2237689 (D. Md. May 20, 2013) (citing *Manfield v. Alutiig Int'l Solutions, Inc.,* 851 F.Supp.2d 196, 204 (D.Me.2012).) Additionally, "[t]he Fourth Circuit allows for the first and second elements [of a 3730(h) claim] to be combined ... [but] consider[s] the facts known to the employee at the time of the protected activity as well as the facts known to the employer at the time of the alleged retaliation." *Dillon v. SAIC, Inc.,* No. 1–12–CV–390, 2013 WL 324062, at *4 (E.D.Va. Jan.28, 2013). As discussed above, Plaintiffs took nearly a dozen opportunities to discuss their concerns with supervisors, company executives and government officials. Their internal reporting qualifies as both protected activity and giving notice to Defendants of their efforts to prevent further violations of the FCA.

## CONCLUSION

Based upon the foregoing, Plaintiff requests that Defendant's Motion to Dismiss be denied so that their claims may proceed.

Respectfully submitted,

/s/ Nicholas Woodfield
Nicholas Woodfield, Esq., VSB# 48938
R. Scott Oswald, Esq. VSB # 41770
nwoodfield@employmentlawgroup.com
soswald@employmentlawgroup.com
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, DC 20006
Telephone:  202.261.2806
Facsimile:  202.261.2835
*Counsel for Plaintiffs Ronald Young
and Ramona Young*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 17, 2013, I served the foregoing brief in opposition to Defendant's Motion to Dismiss via electronic mail upon Defendant's counsel at the following address:

Carlos M. Recio, Esq.
Virginia Bar No. 24572
1016 7the Street, SE
Washington, D.C. 20003

*Counsel for Defendant CHS Middle East, LLC*

Michael A. Sexton
Georgia Bar No. 636489
Weinberg, Wheeler, Hudgens, Gunn & Dial, LLC
3344 Peachtree Road, NE, Suite 2400
Atlanta, Georgia 30326

*Counsel for Defendant CHS Middle East, LLC*

/s/ Nicholas Woodfield
Nicholas Woodfield, Esq., VSB# 48938